UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR PABLO MOLINA,<br><br>                              Petitioner,<br><br>v.<br><br>ERIC ARNOLD, Warden,<br><br>                              Respondent. | Case No.:  16cv720-JLS-MDD<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: PETITION FOR WRIT OF HABEAS CORPUS** |

## I.  INTRODUCTION

This Report and Recommendation is submitted to United States District Judge Janis L. Sammartino pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

Hector Pablo Molina ("Petitioner"), a state prisoner proceeding *pro se*, seeks federal habeas relief from a felony conviction for second degree murder. After reviewing the operative First Amended Petition ("FAP") [ECF No. 6], Respondent's Answer and Memorandum of Points and Authorities in support thereof ("Answer") [ECF No. 13], Petitioner's Traverse [ECF No. 18] and pertinent state court lodgments, the Court **RECOMMENDS** the Petition be

1

**DENIED** for the reasons stated below.

## II.  BACKGROUND FACTS

### A.    State Proceedings

 "[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id.*; *see Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (overruled on other grounds by *Lindh v. Murphy*, 521 U.S. 320 (1997) (stating that federal courts are required to "give great deference to the state court's factual findings.")).

Petitioner argues that the state court opinion is based on an unreasonable determination of facts.  (ECF Nos. 6 at 8, 18 at 2-4).  To prevail on this ground, Petitioner would have to demonstrate that the factual findings upon which the state court's determination rests are objectively unreasonable.  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Petitioner makes no such argument.  Petitioner does not identify facts he believes the Court of Appeal decided incorrectly.  Rather, Petitioner provides the legal standard and makes a conclusory statement that the facts were unreasonably determined.  (*See* ECF Nos. 6 at 8, 18 at 2-4).  Petitioner merely states that "the trial court's reliance on assumptionw [sic], its willingness to disregard those facts pointing to actual bias, and lack of objectivity resulted in clear error and entitle [Petitioner] to relief."  (ECF No. 18 at 3-4).  This is insufficient to show that the Court of Appeal's decision was based on an unreasonable determination of the facts and so this Court will consider its decision under the deferential AEDPA standard of review.  Accordingly, the following facts are taken from the California Court of Appeal's November 20, 2015, opinion in *People v. Molina*, Appeal No. D066260.  (*See* Lodg. No. 6).

*The Prosecution Case*

Jerry Macagno testified that he and [Petitioner] had been friends for many years.  Macagno rented a space on his property on Hollister Street to [Petitioner] so that [Petitioner] could park his motor home there.  [Petitioner] stayed in the motor home most of the time, but sometimes stayed at his mother's home on Clairton Place.

On June 3, 2013, Macagno and [Petitioner] spent the day together.  They went to a bank so [Petitioner] could withdraw money to pay rent to Macagno, and had lunch at a fast-food restaurant.  While running these errands, a prostitute propositioned them.  [Petitioner] offered to procure her services for Macagno, but Macagno declined.  When they returned to Macagno's home, they watched pornography and drank shots of bourbon. Altogether, they consumed up to one and one-half flask-sized bottles of bourbon.

Macagno said [Petitioner] began making phone calls to arrange for prostitutes to come to Macagno's house.  [Petitioner] became increasingly agitated as he was unable to reach the parties he was calling.  [Petitioner] said "he wanted to kill the guy" and made a striking or stabbing gesture.  Sometime that day or the day before, Macagno had given [Petitioner] a hunting knife, which Macagno saw [Petitioner] put in the glove box of [Petitioner's] truck. [Petitioner] then got in his red Dodge truck and drove off.

Melvin Breaux testified that on June 3 he was homeless and lived in a tent near the Strawberry Fields area of Chula Vista. About two months earlier, he befriended another homeless man, David Craig, who had been living in an inoperable van in Strawberry Fields for about three years.  One June 3, Breaux and Craig were sorting bottles for recycling.  About 3:00 p.m., [Petitioner] drove up in his truck.  Breaux had never seen [Petitioner] before, but Craig appeared to know him.  Craig casually walked toward [Petitioner] and said, "What's up, Big John?" [Petitioner] had his hands in his jacket.  Breaux returned to sorting bottles, but later looked up and saw that Craig was bent over and [Petitioner] had him in a headlock.  When [Petitioner] released

Craig, Craig fell to the ground saying, "I don't know why you did that to me. I never done nothing to hurt you," or "[W]hy did you do that to me Big John? I never done nothing to hurt you." [Petitioner] was holding a bloody hunting knife. He walked back to his truck and drove away.

As [Petitioner] drove off, Breaux wrote the license plate number on the dirt. Breaux walked to the area behind a nearby apartment complex and borrowed someone's phone to call 911. Chula Vista police officers arrived within minutes, but Craig was declared dead at the scene. Breaux flagged down one of the arriving officers, recounted what had happened, and drew a picture of [Petitioner's] knife.

Using the license plate information Breaux had captured, police identified a nearby address and broadcast a be-on-the-lookout for [Petitioner's] truck. Two San Diego police officers responded to the broadcast that afternoon and saw [Petitioner's] unoccupied truck parked near his mother's house. They saw [Petitioner] get in his truck and drive off; they tailed him until he parked in Macagno's driveway. After a while, [Petitioner] backed the truck out of the driveway and struck a vehicle that was stopped at a red light. The officers intervened and noticed blood on [Petitioner's] pants and shoes. One of the officers also saw a hunting knife between the driver's and passenger's seat of [Petitioner's] truck. The officers detained [Petitioner] for the Chula Vista police. When [Petitioner] was arrested, he had blood on his hands, shoes, pants, socks, and leg. There was also blood on the truck's steering wheel and ignition switch.

Chula Vista police drove Breaux to where [Petitioner] was detained. Breaux identified [Petitioner] with 100 percent certainty as the person who stabbed Craig. Breaux also saw [Petitioner's] truck and said, "'I think that's the truck that the guy was driving.'"

While [Petitioner] was being booked into jail, he was crying and loudly said, "I can't believe I'm here for hitting that lady's car. Is she okay?" and "God, please forgive me" or "God, please help me."

Chula Vista police detectives Michael Varga and Ricardo Cruz

16cv720-JLS-MDD

interviewed [Petitioner] at the police station about 10:30 p.m. on June 3. [Petitioner] initially provided a detailed accounting of his day, which had him running a variety of errands, none of which involved the victim or Strawberry Fields. When asked to explain why witnesses had seen him and his truck in Chula Vista when he claimed to be at Macagno's house, [Petitioner] changed his story and acknowledged he "might have been in . . . the wrong place at the . . . wrong time" and "saw somebody else . . . do something that . . . was a tragedy . . . ." [Petitioner] claimed he stopped at Strawberry Fields to urinate while picking up dinner for his mother. While there, [Petitioner] heard Craig moaning and saw him on the ground. [Petitioner] had never seen Craig before and did not know who he was. [Petitioner] lifted Craig's body to see if he was alive, but "he didn't seem to be." [Petitioner] said he locked eyes with a Mexican man wearing a gray cap, blue jeans, and a striped shirt. The man ran away and [Petitioner] got back in his truck and left. [Petitioner] acknowledged Macagno had recently given him the hunting knife and that he ([Petitioner]) had shown it to his mother June 2. [Petitioner] had no explanation for how, if the knife had been used in Craig's murder, it ended up in his truck.

When asked about a possible motive for Craig's killing, [Petitioner] told detectives he thought the suspect was "a junkie" he might have done drugs with once in the past. [Petitioner] claimed he had been clean for six months.

A pathologist testified that Craig died from a six-inch-deep stab wound that penetrated his ribs, lungs, and heart. The stab wound was consistent with being caused by the knife that was recovered from [Petitioner's] truck. DNA evidence confirmed that the blood found on the steering wheel, [Petitioner's] shoes, and the knife belonged to Craig. Law enforcement witnesses testified that tire and shoe tread imprints at the crime scene matched the tires on [Petitioner's] truck and tread on [Petitioner's] shoes.

*The Defense Case*

[Petitioner] testified in his defense. He said he got drunk on eight to 10 shots of bourbon at Macagno's house while watching pornography. [Petitioner] made several phone calls in an

unsuccessful attempt to summon prostitutes. [Petitioner] then went to Strawberry Fields, where he had previously bought drugs and used prostitutes.

[Petitioner] claimed he knew both Craig and Breaux from their involvement in the drug trade at Strawberry Fields: Craig sold clean syringes and Breaux was a "doorman" who kept guard for a drug dealer named Paul. Two days before Craig's murder, [Petitioner] purchased a syringe from Craig, purchased drugs from Paul, and had sex with a prostitute Breaux provided.

On June 3, [Petitioner] went to Strawberry Fields to buy drugs and obtain prostitutes. He purchased a syringe from Craig and then, with Breaux's help, purchased drugs from Paul. [Petitioner] got high with a prostitute and used her services. As he was leaving, he gave Craig some drugs as a tip and returned to his truck. [Petitioner] remembered he had a used syringe in his pocket and started to walk back into the fields to put it in a tree where people leave used needles.

[Petitioner] heard a "commotion" around Craig's van. [Petitioner] saw a man leaving and Craig lying in a pool of blood. [Petitioner] lifted Craig's body, but heard his "last gasp." [Petitioner] said he saw a man leaving Strawberry Fields. The man looked at [Petitioner], so [Petitioner] "got the hell out of there as fast as [he] could." Still drunk and high, [Petitioner] returned to Macagno's house to stash some of his leftover drugs.

[Petitioner] testified he did not see the knife in his truck and did not know how it ended up there. He acknowledged Macagno had given him a hunting knife earlier, but claimed he gave it to Breaux two weeks earlier in exchange for drugs.

[Petitioner] testified he lied during his interview with detectives to protect his drug connections. He claimed he was still drunk and high during the interview and did not remember what he said or why he answered the way he did.

[Petitioner] called two additional witnesses. Rosa Valenzuela (the mother of the woman who loaned her phone to Breaux) testified

she saw a red Ford truck near Strawberry Fields around the time of the murder that did not resemble photographs of [Petitioner's] truck. [Petitioner's] cousin, Bertha Luna, testified she smoked drugs with Breaux on several occasions, and heard Breaux's associates state that Breaux told the police that [Petitioner] had killed someone "they had killed."

### Jury Verdict and Sentence

The People charged [Petitioner] with the first degree murder of Craig and further alleged [Petitioner's] personal use of a knife. (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1).) The jury found [Petitioner] guilty of second degree murder and made a true finding on the knife-used enhancement. The trial court sentenced [Petitioner] to an indeterminate term of 15 years to life and credited him with 382 days of presentence custody.

(Lodg. No. 6 at 2-8 (footnotes omitted)).

Petitioner appealed from the judgment, raising three issues: (1) the trial court erred by limiting his ability to impeach Breaux with evidence that Breaux was currently under investigation for stalking his ex-wife, which violated the prosecutor's *Brady v. Maryland* ("*Brady*") obligations by failing to disclose the full substance of that investigation; (2) the trial court erred by denying Petitioner's motion to dismiss, which claimed that the arresting officers should have preserved his blood alcohol level by taking a blood sample at the time of arrest; and (3) the trial court erred by excluding Petitioner's expert witness, who would have testified that the police should have taken Petitioner's blood sample at the time of his arrest. (*See* Lodg. No. 3). The Court of Appeal affirmed the trial court's judgment, but found that the trial court miscalculated Petitioner's presentence custody credits and directed the trial court to amend the abstract of judgment to reflect one additional day of presentence custody credits. (Lodg. No. 6 at 25).

On December 17, 2015, Petitioner petitioned the California Supreme

Court for review of the Court of Appeal's November 20, 2015, opinion.  (Lodg. No. 7).  Petitioner raised two arguments: (1) the trial court erred by limiting his ability to impeach Breaux with evidence that Breaux was currently under investigation for stalking his ex-wife, which violated the prosecutor's *Brady* obligations by failing to disclose the full substance of that investigation; and (2) the trial court erred by denying Petitioner's motion to dismiss, which claimed that the arresting officers should have preserved his blood alcohol level by taking a blood sample at the time of arrest.  (*Id.*).  On February 2, 2016, the California Supreme Court denied Petitioner's petition for review. (Lodg. No. 8).

Petitioner did not seek collateral review in the state courts.  (*See* Lodg. Nos. 1-8; ECF No. 6 at 5).

## B.    Federal Proceedings

On May 20, 2016, Petitioner filed the operative First Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 6). Petitioner raises two grounds for relief: (1) the trial court erred by failing to disclose the full substance of Breaux's investigation, which also violated the prosecutor's *Brady* obligations; and (2) the trial court erred by denying Petitioner's motion to dismiss, which claimed that the arresting officers should have preserved his blood alcohol level by taking a blood sample at the time of arrest.  (*Id.* at 6, 7).  Both grounds were raised in the California Supreme Court.  (*Id.* at 2; *see* Lodg. No. 7).

On September 8, 2016, Respondent filed an Answer.  (ECF No. 13).  On October 7, 2016, Petitioner filed a Traverse.  (ECF No. 18).

## III.  STANDARD OF REVIEW

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh*, 521 U.S. 320.

Title 28, U.S.C. § 2254(a) provides the scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the grounds that he is in custody in violation of the Constitution or laws or treaties of the United States.

Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . . ." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A state court's decision may be "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Id.* at 405.  A state court decision does not have to demonstrate an awareness of clearly established Supreme Court precedent, provided neither the reasoning nor the result of the state court decision contradict such precedent. *Early*, 537 U.S. at 8.

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of

the particular state prisoner's case." *Williams*, 529 U.S. at 407. An unreasonable application may also be found "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).

Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S.Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). An unreasonable application of federal law requires the state court decision to be more than incorrect or erroneous. *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). Instead, the state court's application must be "objectively unreasonable." *Id.* at 76; *Miller-El*, 537 U.S. at 340. Even if a petitioner can satisfy § 2254(d), the petitioner must still demonstrate a constitutional violation. *Fry v. Pliler*, 551 U.S. 112, 119-22 (2007).

Federal courts review the last reasoned decision from the state courts. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991); *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). The petitioner must establish that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error . . . beyond any

possibility for fairminded disagreement. . . ." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) (citation omitted).  It is not within a federal habeas court's province "to reexamine state court determinations on state-law questions. . . ." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

# IV.  DISCUSSION

## A.    Claim 1: Failure to Disclose Breaux's Background Information Learned at an *In Camera* Hearing

Petitioner argues the trial court and the prosecutor erred in failing to disclose to Petitioner that the prosecution's witness, Breaux, used to be a police officer who was injured on duty, subsequently became addicted to pain medications, moved to California and was unable to obtain employment as a California Highway Patrol ("CHP") Officer.  (ECF Nos. 6 at 6, 18 at 4-6).

### 1.  State Court Opinion

Petitioner presented this claim to the state appellate and supreme courts on direct review.  (Lodg. Nos. 3, 7).  The appellate court denied Petitioner's claim on the merits.  (Lodg. No. 6 at 8-19).  The California Court of Appeal rejected Petitioner's contentions that the trial court erred by failing to disclose information learned "during an in camera examination of the detective leading the stalking investigation" and that the prosecutor committed a *Brady* violation "by failing to disclose the substance of the stalking investigation to the defense."  (Lodg. No. 6 at 8).  The California Supreme Court summarily denied the petition without a statement of reasoning or citation to authority.  (Lodg. No. 8).  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for authority.  *Ylst*, 501 U.S. at 805-06.  That court wrote:

> [Petitioner] contends the trial court committed a variety of errors in its handling of the defense's request to impeach Breaux on

the basis that he was being investigated for stalking his ex-wife. He contends the court erred by . . . failing to disclose what it learned during an in camera examination of the detective leading the stalking investigation . . . . [Petitioner] also contends the prosecutor committed a *Brady* violation by failing to disclose the substance of the stalking investigation to the defense.    We reject these contentions.

## A.  *Proceedings Below*

The primary defense theory at trial was that Breaux was framing [Petitioner] for Craig's murder or was somehow otherwise involved.   Defense counsel vigorously cross-examined Breaux and impeached him on several points.   For example, defense counsel elicited that Breaux (1) initially described the suspect as having a pony tail and wearing denim shorts and work boots, when none of that was true of [Petitioner]; (2) said Craig addressed the perpetrator as "Big John," when [Petitioner] has never gone by that name; (3) initially denied using drugs, but later admitted smoking drugs with Luna on one occasion (which Luna further impeached by testifying they had used drugs together six times); (4) was receiving room and board from the district attorney's office under a witness protection program; and (5) was uncooperative with [Petitioner's] investigator.

In support of his defense, [Petitioner] points out his testimony put the murder weapon in Breaux's hands two weeks before the murder and revealed Breaux as a doorman for drug dealing and prostitution activities.   Both Valenzuela's testimony impeached Breaux's description of [Petitioner's] truck, and Rosa's testimony challenged Breaux's ability to see what he claimed to have seen from his claimed location.   And Luna testified she heard Breaux's associates claim that Breaux told the police that [Petitioner] had killed someone "they had killed."

In closing argument, defense counsel (1) reminded the jury [Petitioner] testified he traded the murder weapon for drugs or prostitution "with none other than the People's star witness Melvin Breaux"; (2) argued "something was going [on] out there" and "Mr. Breaux was involved in it"; (3) insinuated Breaux was falsely

accusing [Petitioner] "to get a roof over his head"; and (4) noted the prosecutor elicited that Breaux suffered a felony conviction for burglary in 2000.

During defense counsel's cross-examination of Breaux, counsel requested a sidebar conference regarding an additional impeachment topic related to the prosecutor's disclosure at the preliminary hearing that Breaux was being investigated for domestic violence. Defense counsel wanted "to inquire of [Breaux] whether or not he has received a direct or implied immunity from the prosecution . . . from that criminal act because of his role here in this case." The prosecutor responded she had been "constantly checking" on the stalking matter and nothing had been submitted by police to the district attorney's office for prosecution. The prosecutor "unequivocally" represented that Breaux had received "[a]bsolutely nothing" in the stalking matter in exchange for his testimony in [Petitioner's] case. The court tentatively ruled defense counsel could not cross-examine Breaux on the pending investigation, but directed the prosecutor to make an affirmative inquiry of the police to determine the status of the investigation.

Defense counsel later informed the court the prosecutor had put him in touch with the detective investigating the stalking claim (San Diego police detective Kevin McNamara), but the detective would not answer his questions due to confidentiality concerns. The court directed the prosecutor to produce McNamara for examination in court.

Detective McNamara testified in an evidentiary hearing outside the jury's presence. He testified he was investigating allegations by Breaux's ex-wife that Breaux had stalked her, but Breaux had not been arrested yet. When the judge asked a series of questions about whether any law enforcement agents or prosecutors had interfered in any way with McNamara's investigation or sought to provide Breaux with immunity on the stalking claim, McNamara responded "[a]bsolutely not." McNamara testified the current case against [Petitioner] would in no way impact his decisions as to the handling of the stalking case.

McNamara explained his investigation had been delayed for

several factors.  First, when he learned Breaux was under the "control" of the detectives handling [Petitioner's] case, McNamara purposefully refrained from contacting Breaux to avoid "mix[ing] the two cases."  Second, McNamara's assignment in the police department changed and he was handling higher-priority matters.  Third, McNamara had recently learned of some additional information that he thought would be "extremely probative to the [stalking] case," but he preferred not to divulge it in open court.  Despite the delay in his investigation, McNamara emphasized, "It's not only my intent [to ultimately forward the case to the district attorney's office for prosecution], but under oath it will be done."

On cross-examination, McNamara explained he had never talked to Breaux nor told him about the investigation, but he "would not be surprised if Breaux knows about the allegations" because Breaux's daughter knows generally of them and is in contact with both of her parents.

The court briefly examined McNamara in camera and sealed the transcript.  On the record, the court stated, "I have interviewed Detective McNamara regarding what he called a recent piece of information that has affected his processing of this case.  And he's revealed that to me and that I find is no way relevant to any matters that are pending before this court on this case."

Defense counsel argued that because Breaux was being investigated for stalking his ex-wife, [Petitioner] has "a right to see whether or not the information gathered by [McNamara] on Mr. Breaux has any probative or relevant information that will support our defense" theory that "Breaux is framing [Petitioner] for this murder . . . ."  Defense counsel also wanted to further explore whether Breaux had received any immunity deal or was shading his testimony in this case in hopes of getting one.

The court denied both defense requests, noting the "purpose of this hearing was limited" to the issue of "whether there is a deal offered to Breaux; immunity, leniency, potential plea bargains in the future on the case Detective McNamara is working on."  The court found "McNamara was very, very plain he's had no interference, no prompts, no requests from anybody in the D.A's

office on how to deal with his D[omestic][]V[iolence] case . . . . So I'm not going to allow Breaux or Detective McNamara to testify. I'm convinced there are no deals."

The court also denied defense counsel's request for discovery of McNamara's investigative findings. The court refused to allow the case to "spin off in that direction" when trial was "almost finished" and the stalking allegations were not "relevant to what we're dealing with in this case . . . ."

### B. *No Error in Not Disclosing the Information McNamara Revealed* In Camera

Having since read the sealed transcript, [Petitioner] now contends the trial court erred by not disclosing the following information that Detective McNamara revealed during the court's in camera examination:

"I know that Mr. Breaux used to be a New Orleans police officer and he was involved in an on-duty accident. He got addicted—this is coming from the victim—he got addicted to the pain meds. They moved out of New Orleans, actually came to California. He tried to become a CHP officer, but was turned out during the psychological for some anger issues. [¶] In my opinion, Mr. Breaux's got a great amount of street sense."

[Petitioner] asserts the trial court's receipt of McNamara's testimony in camera is analogous to a trial court's in camera review of personnel files under a *Pitchess* motion. We review these determinations for an abuse of discretion.

Assuming without deciding that analogizing to the *Pitchess* framework is appropriate, we conclude the trial court did not abuse its discretion by finding Breaux's status as a former police officer, his workplace injury and resulting addiction to pain medications, and his alleged anger management issues immaterial to this case. To the extent Breaux's employment experience and workplace injury contributed to his "street sense" or potential problems with his powers of observation or recall, the trial court did not preclude [Petitioner] from cross-examining Breaux on these grounds

15

16cv720-JLS-MDD

generally.  Indeed, as noted above, defense counsel extensively cross-examined and impeached Breaux.  Additional detail about Breaux's background would not have materially aided that effort.

We also reject [Petitioner's] contention that Breaux's alleged history of anger management issues "would directly have impacted the defense theory that Breaux could have been the killer and was framing [Petitioner]."  As propensity evidence, the trial court could properly have concluded Breaux's history of anger was inadmissible character evidence.  As third party culpability evidence, the trial court could properly have concluded Breaux's alleged history of anger issues is not sufficiently related to the manner in which Craig was murdered so as to identify Breaux as the real perpetrator.  Either of these bases supports the trial court's exercise of discretion.

Because we find no abuse of discretion in the trial court's determination that defendant was not entitled to disclosure of the information that Detective McNamara revealed during his in camera examination—because it was in "no way relevant to any matters that are pending before this court on this case"—we likewise find no abuse of discretion in the trial court's denial of [Petitioner's] request to obtain the same information by way of discovery of McNamara's investigative file.

. . . .

### D.  *The Prosecutor Did Not Violate Her Brady Disclosure Obligations*

[Petitioner] contends the prosecutor violated her *Brady* obligations by failing to disclose the substance of McNamara's investigation of Breaux.  We disagree.

"Under *Brady* and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence."  "The duty to disclose 'exists even though there has been no request by the accused.'"  "For *Brady* purposes, evidence is material if it is reasonably probable its disclosure would alter the outcome of trial."

16cv720-JLS-MDD

This "requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]."

The scope of a prosecutor's *Brady* disclosure obligation "'extends beyond the contents of the prosecutor's case file and encompasses the duty to ascertain as well as divulge "any favorable evidence known to the others acting on the government's behalf."'" "Thus, the prosecution is responsible not only for evidence in its own files but also for information possessed by others acting on the government's behalf that [was] gathered in connection with the investigation. But the prosecution cannot reasonably be held responsible for evidence in the possession of *all* governmental agencies, including those not involved in the investigation or prosecution of the case." "'Conversely, a prosecutor does not have a duty to disclose exculpatory evidence or information to a defendant unless the prosecution team actually or constructively possesses that evidence or information. Thus, information possessed by an agency that has no connection to the investigation or prosecution of the criminal charge against the defendant is not possessed by the prosecution team, and the prosecution does not have the duty to search for or to disclose such material.'"

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." We review de novo whether a defendant has established a *Brady* violation.

Our independent review of the record reveals the prosecutor did not violate her disclosure obligations under *Brady*. First, she was not obligated to disclose the substance of McNamara's investigation because he was not part of the prosecutorial team. McNamara is a detective with the San Diego Police Department; Craig's murder was investigated by the Chula Vista Police Department. The San Diego Police Department's only apparent involvement in [Petitioner's] case was the initial traffic stop by the

two patrol officers who detained [Petitioner] until Chula Vista police officers arrived.

Second, the prosecutor was not obligated to disclose the substance of the investigation because, as discussed in part I.B., *ante*, we agree with the trial court's conclusion that the information [Petitioner] sought is not material.

Finally, and in any event, even if the prosecutor were obligated to disclose Breaux's investigation, she satisfied her obligation. She disclosed the investigation at the very outset of the preliminary hearing; "constantly check[ed] the status"; put [Petitioner's] counsel in touch with Detective McNamara; and produced McNamara for examination by the court *and defense counsel.* By doing so, the prosecutor satisfied any *Brady* obligation she had with respect to the substance of the investigation.

(Lodg. No. 6 at 8-19 (internal citations and footnotes omitted)).

## 2. Summary of Arguments

Petitioner argues that the court of appeal's decision finding no error in failing to disclose the information Detective McNamara revealed *in camera*[1] and no *Brady* violation by the prosecutor were incorrect because Breaux was the key witness in the prosecution's case.  (ECF No. 18 at 4)[2].  As such, Petitioner contends that Breaux's credibility was "key to the case" because he

---

[1] Petitioner refers to this as a *Pitchess* violation.  California's legislature enacted procedures implementing the *Pitchess v. Superior Court*, 11 Cal.3d 531 (1974) decision "which allow criminal defendants to seek discovery from the court of potentially exculpatory information located in otherwise confidential peace officer personnel records.  If a party bringing what is commonly called a *Pitchess* motion makes a threshold showing, the court must review the records in camera and disclose to that party any information they contain that is material to the underlying case." *People v. Superior Court*, 61 Cal.4th 696, 705 (2015).

[2] All pincite page references refer to the automatically generated ECF page number, not the page number in the original document.

16cv720-JLS-MDD

was the only witness to Craig's murder and directly identified Petitioner as the killer. (*Id.*). Specifically, Petitioner contends that disclosure of the following testimony from the *in camera* hearing would have weakened Breaux's credibility and strengthened Petitioner's defense that he did not kill Craig:

> I know that Mr. Breaux used to be a New Orleans police office[r] and he was involved in an on-duty accident. He got addicted – this is coming from the victim – he got addicted to the pain meds.[ ]They moved out of New Orleans, actually came to California.[ ]He tried to . . .[]become a CHP officer, but he was turned down during the psychological for some anger issues. [p] In my opinion,[]Mr. Breaux's got a great amount of street sense."

(*Id.* at 5).

Respondent argues that the court of appeal reasonably concluded that there was no *Brady* violation because the information was not in the hands of the prosecution, the information was not material, and the prosecutor properly alerted the court and the defense that Breaux was under investigation by another government agency. (ECF No. 13-1 at 12). Further, Respondent argues that Petitioner's so-called *Pitchess* violation is not cognizable because it deals only with state law discovery issues. (*Id.* at 23).

### 3. Legal Standard

If Petitioner were to argue that the trial court erred in denying a *Pitchess* motion, Respondent would be correct that Petitioner's *Pitchess* claim is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). That is not what Petitioner argues. (*See* ECF Nos. 6, 18). Petitioner argues that the trial court erred in failing to disclose to Petitioner information, similar to *Pitchess* information, that was revealed in an *in camera* hearing. (ECF Nos. 6 at 6, 18 at 4-6). Denial of

16cv720-JLS-MDD

access to an investigative report on a key witness could present a cognizable claim to the extent it affects Petitioner's right to receive necessary exculpatory or impeachment evidence. *Giglio v. United States*, 405 U.S. 150, 154 (1972) (finding that impeaching evidence is exculpatory evidence within the meaning of *Brady*). The Due Process Clause requires the government to produce to the defense favorable evidence material to a criminal defendant's guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). California's Supreme Court stated that *Pitchess* procedures parallel the prosecution's obligations under *Brady*. *Williams v. Malfi*, No. CV 06-4367-DOC (JTL), 2008 WL 618895 at *10 (C.D. Cal. Jan. 25, 2008) (citing *City of Los Angeles v. Superior Court*, 29 Cal. 4th 1, 14 (2004)).

Under *Brady*, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *U.S. v. Bagley*, 473 U.S. 667, 682 (1985)). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

"*Brady/Giglio* information includes 'material . . . that bears on the credibility of a significant witness in the case.'" *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004) (citing *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1461 (9th Cir. 1993)). Impeachment evidence is favorable to the accused "when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence." *Id.* (citation and quotation marks omitted).

### 4. Analysis

Petitioner's first ground for relief asks whether the trial court and prosecution erred in failing to disclose to the defense Detective McNamara's testimony from the *in camera* hearing.  (ECF Nos. 6 at 6, 18 at 4-6).  As discussed above, both grounds for relief are analyzed under the *Brady* standard.

The facts show that on March 4, 2014, Detective McNamara appeared in court for a hearing outside the presence of the jury.  (Lodg. No. 2 at 987). Detective McNamara testified that Breaux was not arrested for stalking his ex-wife, that he has not spoken with Breaux and that the case has not yet been submitted to the Family Protection Unit in South Bay.  (*Id.* at 989-91). He also testified that Breaux's case has nothing to do with Petitioner's murder case and "this particular case has had zero influence on [Detective McNamara's] case or what will be done with [Detective McNamara's] case." (*Id.* at 991-92).  Detective McNamara denied that Breaux had been "offered any deals, whether it's immunity, whether it's requests, misdemeanor versus a felony, whether it's a sentencing, ultimate sentencing" and stated that "under oath" he will forward Breaux's case to the South Bay's District Attorney for prosecution.  (*Id.* at 995-96).

During the hearing, Detective McNamara revealed that two weeks prior to the hearing he learned new information that "would be – if Mr. Breaux is responsible for it, it will be extremely probative to the case."  (*Id.* at 992). When asked what kind of information he received, Detective McNamara asked "Is there any way I can tell you outside the presence . . ." (*Id.*).  The court determined there was a preliminary showing of confidentiality and materiality to warrant an *in camera* hearing regarding this information and ordered the transcript sealed.  (*Id.* at 999).  While the sealed transcript was

not included in the record, it appears that Petitioner obtained a copy of it and claims error in the trial court's failure to disclose that Breaux used to be a police officer who was involved in an on-duty accident, became addicted to pain medications and that Breaux was not offered a CHP officer position because of anger issues. (*See* ECF No. 18 at 5).

The first component of a *Brady* violation is not met. *Strickler*, 527 U.S. at 281-82 (1999) (stating that the first component of a true *Brady* violation is that the evidence is favorable to the accused). Breaux's status as a former police officer, his workplace injury, addiction to pain medications and anger management issues do not satisfy the favorable to the accused standard. While this information would bear on the credibility of a significant witness for the prosecution, Breaux's reliability was not determinative of Petitioner's guilt or innocence. *See Giglio*, 405 U.S. at 154.

There was overwhelming evidence that permitted the jury to determine Petitioner's guilt. Macagno testified that Petitioner became "agitated," "rough," "mad" and violent. (Lodg. No 2 at 356, 357, 359, 361). Macagno also testified that Petitioner was making stabbing demonstrations and saying he wanted to "kill the guy." (*See id.* at 359-64, 374). When shown a picture of the hunting knife used to kill Craig, Macagno testified that it was his knife and he gave it to Petitioner the day before Craig's murder. (*Id.* at 378-79).

San Diego Police Officer Katrina Young testified that when her partner went to detain Petitioner, she immediately noticed blood on Petitioner's shoes and pants and when she looked in Petitioner's car she immediately saw a knife in between the driver's and passenger's seat. (*Id.* at 493-94). Chula Vista Police Officers Johnathon Deering and Michael Varga also testified that Petitioner had dried blood on his pants and blood spatter on his shoes. (*Id.* at 502-03, 533-34). Additionally, Officer Varga testified that he saw a

16cv720-JLS-MDD

knife in Petitioner's car.  (*Id.* at 537-38).  Chula Vista Detective David Beatty testified that the shoes Petitioner wore at the time of the arrest had a tread pattern that was "very similar" to the dirt impression of tread patterns at the scene of the crime.  (*Id.* at 669-71).  DNA analyst Monica Ammann testified that the blood on Petitioner's car's steering wheel, Petitioner's shoes and the knife found in Petitioner's car matched the victim's DNA.  (*Id.* at 862-75).

In this case, there was overwhelming evidence that permitted the jury to determine Petitioner's guilt, regardless of Breaux's credibility.  As such, the impeaching evidence was not favorable to Petitioner because Breaux's reliability, although important, was not determinative of the case.

The second component of a *Brady* violation is met as applied to the Court.  *Strickler*, 527 U.S. at 281-82 (1999) (stating that the second component of a true *Brady* violation is that the state withheld the evidence).  The Court held an *in camera* hearing where it obtained information regarding Breaux's background, including that he was a police officer in New Orleans who became addicted to pain medications and was unable to obtain employment in California as a CHP officer.  (Lodg. No. 2 at 999; ECF No. 18 at 5).  The transcript was sealed and the information was not disclosed to Petitioner at trial.  (Lodg. No. 2 at 999).  As a result, the trial court did withhold the evidence from Petitioner.  However, Petitioner must satisfy all three *Brady* components to succeed in showing a *Brady* violation.

The second component is not met as applied to the prosecutor.  Ms. Golovato, the prosecutor, informed the trial court at the preliminary hearing that Breaux had a domestic violence case pending.  (*Id.* at 1).  However, she also stated that didn't know anything about the facts.  (*Id.*).  Ms. Golovato contacted Detective McNamara at the trial court's request and provided the defense with his contact information.  (*Id.* at 810).  The defense attempted to

16cv720-JLS-MDD

elicit information from Detective McNamara, but Detective McNamara raised confidentiality and privacy issues. (*Id.* at 811). The trial court then decided to hold a hearing outside the presence of the jury with Detective McNamara, which ultimately led to a short *in camera* hearing. (*Id.* at 999). Ms. Golovato was not present at the *in camera* hearing, and therefore, could not have learned that Breaux was a police officer with a pain medication addiction who was unable to obtain employment as a CHP officer. (*See id.*). As a result, Ms. Golovato could not have withheld information she did not have.

The third component of a *Brady* violation is also not satisfied. *Strickler*, 527 U.S. at 281-82 (1999) (stating that the third component of a true *Brady* violation is that prejudice must have ensued). "[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 281. As discussed above, the jury had overwhelming evidence to determine Petitioner's guilt even absent Breaux's testimony. In addition to Breaux's testimony, the prosecution presented forensic evidence sufficient to permit the jury to determine Petitioner's guilt, including proof that the victim's blood was on Petitioner's shoes, pants and steering wheel. The prosecution also presented Macagno's testimony about Petitioner's behavior before the murder.

Additionally, the defense vigorously impeached Breaux at trial. (*See* Lodg. No. 2 at 259-318, 329-34, 335-337). Petitioner's trial counsel highlighted the fact that Breaux was homeless and "excluded" from his former marital residence, heard Craig address the suspect as "Big John," when Petitioner's name is Hector Pablo Molina and has never gone by Big John, denied using drugs but later admitted using drugs on at least one occasion and received room and board from the district attorney's office under

a witness protection program.  (*Id.* at 259, 296-97, 300-02).  It is unlikely that the comparatively neutral fact that Breaux used to be a police officer who became addicted to pain medications and could not obtain employment as a CHP officer due to anger issues would have altered the jury's determination of his credibility.  *See Silva v. Brown*, 413 F.3d 980, 989-90 (9th Cir. 2005) (undisclosed evidence of witness's competency issues was material for its "potency" and ability to raise "new and more powerful doubts about the reliability of [the witness's] testimony"); *Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002) (undisclosed impeachment evidence of witness's prior convictions, misrepresentations to law enforcement, and drug use was material where it "was substantial and was far more damaging to [the witness's] credibility than the impeachment evidence available to the defense at trial"); *Grajeda v. Scribner*, No. CV 03-7280-PSG(CW), 2011 WL 4802564 at *43 (C.D. Cal. Aug. 1, 2011) (finding no prejudice where undisclosed impeaching evidence that a witness was an FBI informant was cumulative and less damaging than other impeachment evidence presented against him at trial).  In sum, it was not reasonably probable that, had this evidence been disclosed to the defense, the result of the proceeding would have been different.

The state court objectively and reasonably concluded that neither the trial court nor the prosecution erred in failing to disclose information about Breaux's past.  This Court reaches the same conclusion, and recommends finding the state court's determination is not unreasonable or contrary to federal law.  Accordingly, this Court **RECOMMENDS** claim one (1) be **DENIED**.

### B.    Claim 2: Error in Denying Petitioner's Motion to Dismiss

Petitioner argues that the trial court erred in denying his motion to

1  dismiss on the grounds that arresting officers should have preserved his

2  blood alcohol level by taking a blood sample at the time of arrest.  (ECF No. 6

3  at 7).  Petitioner contends that his blood sample could have supported an

4  affirmative defense of intoxication.  (*See id.*).

### 1. State Court Opinion

Petitioner also presented this claim to the state appellate and supreme

courts on direct review.  (Lodg. Nos. 3, 7).  The appellate court denied

Petitioner's claim on the merits.  (Lodg. No. 6 at 19-22).  The California Court

of Appeal rejected Petitioner's contention that the trial court should have

dismissed the case because police violated Petitioner's due process rights by

failing to take samples of his blood to determine his level of intoxication at

his arrest, which could have supported an affirmative defense of intoxication.

(*Id.*).  The California Supreme Court summarily denied the petition without a

statement of reasoning or citation to authority.  (Lodg. No. 8).  Accordingly,

this Court must again "look through" to the state appellate court's opinion

denying this claim.  *Ylst*, 501 U.S. at 805-06.  That court wrote:

II.  *Preservation of Defendant's Blood Alcohol Level*

Defendant moved under *California v. Trombetta* (1984) 467
U.S. 479 and *Arizona v. Youngblood* (1988) 488 U.S. 51 to dismiss
the case (or, alternatively, for an ameliorative instruction and an
evidentiary hearing) because "the police violated [Petitioner's] due
process rights by failing to obtain samples of his blood to determine
his level of intoxication at the time of arrest."  He asserts a blood
sample may have supported an affirmative defense of intoxication.
We find no error.

The two San Diego police officers who followed [Petitioner]
from Clairton Place to Hollister Street and initially detained him
that afternoon testified [Petitioner] did not swerve while driving.
When standing within a foot of defendant, they smelled no odor of
alcohol and observed no other signs of intoxication.  The Chula

16cv720-JLS-MDD

Vista police officer who took [Petitioner] into custody and transported him to the police station testified he was in [Petitioner's] presence for over one hour and smelled no odor of alcohol and observed no other signs of intoxication.

When Detectives Varga and Cruz interviewed Macagno on the afternoon of June 3, Macagno told them he and [Petitioner] had been drinking bourbon that day and [Petitioner] appeared "plastered." Macagno said there were two empty bottles in the trash can at his house. Detective Cruz testified that, because of this, he closely observed Macagno for signs of intoxication and observed none. This caused Cruz to doubt Macagno's statement about the quantity of liquor the men had consumed.

Nevertheless, Cruz and Varga paid particular attention to [Petitioner's] demeanor when they interviewed him later that night. Cruz testified [Petitioner] responded promptly to commands; walked normally down a 30- or 40-foot-long hallway while handcuffed; and gave off no odor of alcohol and displayed no other signs of intoxication. Based on his observations, Cruz testified, "If this contact had occurred out in the field and he was driving under the same circumstances . . . , I would have handed him his keys back. That is how confident I was that he was not under the influence." Cruz concluded he would not have had probable cause to obtain a warrant to draw [Petitioner's] blood. Detective Varga similarly testified he did not detect the odor of alcohol emanating from [Petitioner] or observe any other signs of intoxication.

During his interview, [Petitioner] told Detectives Varga and Cruz he had only "a couple shots" of bourbon and boasted of being sober for six months. At trial, however, [Petitioner] testified he was drunk on bourbon and high on heroin and methamphetamine on June 3, including during his interview with detectives.

The trial court denied [Petitioner's] motion to dismiss, but allowed [Petitioner] to argue the police were "incompetent" in their treatment of the issue and instructed the jury on voluntary intoxication.

[Petitioner] acknowledges his challenge "in part has been

addressed" by the California Supreme Court's recent decision in *People v. Montes* (2014) 58 Cal.4th 809 (*Montes*), but requests "the extension of existing precedent." No extension is warranted here.

*Montes* acknowledged that although "due process does not require the police to *collect* particular items of evidence," *Trombetta* recognized that due process does impose "a duty on the state to *preserve* 'evidence that might be expected to play a significant role in the suspect's defense.'" However, for the obligation to preserve evidence to arise, the "evidence 'must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" "A trial court's ruling on a *Trombetta* motion is upheld on appeal if a reviewing court finds substantial evidence supporting the ruling."

The defendant in *Montes* moved to dismiss under *Trombetta* on the ground the police should have taken a blood sample when they arrested him, which may have supported an intoxication defense. The Supreme Court concluded the trial court properly denied the motion because, even assuming *Trombetta* imposed a duty to *collect* apparently exculpatory evidence, there was none because (1) the arresting officers testified they did not believe the defendant was under the influence of drugs when they arrested him 24 hours after the murder, and (2) the record "failed to establish an apparent exculpatory connection between the possible presence of a narcotic in a defendant's blood when he was arrested and his level of intoxication, if any, when the murder was committed nearly 24 hours earlier."

*Montes* is controlling here. Five law enforcement witnesses testified uniformly that there was nothing apparently exculpatory about [Petitioner's] condition at the time of his arrest or interrogation. This alone is dispositive. Further, [Petitioner] offered no evidence of the exculpatory value of his intoxication level hours after Craig's murder. Because the officers who detained and transported [Petitioner] observed no signs he was intoxicated, the first suggestion [Petitioner] had been drinking arose during Macagno's interview sometime after 6:00 p.m. (about three hours after the murder). [Petitioner] did not tell anyone he had been

28

16cv720-JLS-MDD

drinking until after 10:30 p.m. (about seven hours after the murder), and even then he downplayed his consumption. This substantial evidence supports the trial court's ruling.

*Montes* and *Trombetta* aside, the trial court instructed the jury on intoxication and defense counsel vigorously cross-examined the law enforcement witnesses regarding their conclusions [Petitioner] was not intoxicated. The trial court did not err in denying [Petitioner's] motion to dismiss.

(Lodg. 6 at 19-22) (internal citations omitted).

## 2. Summary of Arguments

Petitioner contends that "the police violated [Petitioner's] due process rights by failing to obtain samples of his blood to determine his level of intoxication at the time of his arrest." (ECF No. 6 at 7). Petitioner explains that both Petitioner and Macagno told police they had been drinking the day of Craig's murder. (*Id.*). Petitioner asserts that the police should have taken samples of his blood at that time because they knew Petitioner was under arrest for murder and that intoxication is a defense to murder. (*Id.*). In his Traverse, Petitioner further argues that the failure to take samples of Petitioner's blood after learning Petitioner had been drinking "is tantamount to destruction of evidence." (ECF No. 18 at 7, 9).

Respondent contends the state court reasonably concluded that the police had no duty to obtain a blood sample from Petitioner. (ECF No. 13-1 at 27). Respondent first points out the "incongruity" in Petitioner's argument that his blood sample would have been used to support an intoxication defense because Petitioner's defense at trial was that he did not kill Craig. (*Id.*). Respondent then argues that "there is no clearly established Supreme Court precedent on collection of evidence that the state court could have acted contrary to or applied in an unreasonable fashion. This bars relief." (*Id.* at 31). Even if there were Supreme Court precedent, Respondent

contends Petitioner's claim would fail because he cannot show either exculpatory value of his blood sample or the police officers' bad faith in failing to take a blood sample. (*Id.*).

### 3. Legal Standard

In general, law enforcement officials have a duty to preserve "evidence that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984). While the Supreme Court has not directly addressed the duty to collect evidence, some courts have held that *Trombetta* includes the duty to collect evidence. *Miller v Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989) (finding that the failure to collect potentially exculpatory evidence could be a due process violation). This duty applies only to "material evidence, i.e., evidence whose exculpatory value was apparent before its destruction and that is of such nature that the defendant cannot obtain comparable evidence from other sources." *Cooper v. Calderon*, 255 F.3d 1104, 1113 (9th Cir. 2001) (citing *Trombetta*, 467 U.S. at 489). Additionally, the failure to preserve potentially exculpatory evidence amounts to a due process violation only when the petitioner "can show bad faith." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Miller*, 868 F.2d at 1120 ("Since, in the absence of bad faith, the police's failure to *preserve* evidence that is only potentially exculpatory does not violate due process, then a fortiori neither does the good faith failure to *collect* such evidence violate due process.") (emphasis in original). Bad faith "turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Martinez v. Barnes*, No. 2:12-cv-2975 KJM GGH P, 2013 WL 5773108 at *5 (E.D. Cal. Oct. 24, 2013) (citing *Youngblood*, 488 U.S. at 56-57; *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993)). //

### 4. Analysis

Assuming without deciding that the duty to collect evidence is within *Trombetta*, this Court concludes that the appellate court's decision was not objectively unreasonable and not contrary to federal law.  Petitioner's blood sample, which purportedly would have shown that Petitioner was intoxicated, would not have had exculpatory value that was apparent at the time of Petitioner's arrest.  Petitioner also has not shown that police acted with bad faith in failing to take Petitioner's blood sample.

San Diego Police Officer Jason Tsui testified he did not smell any alcohol on Petitioner at the time of the car accident and "didn't think [any sobriety testing] was necessary" because Petitioner did not appear to be under the influence.  (Lodg. No. 2 at 475-77).  San Diego Police Officer Katrina Young also testified that she did not notice the odor of alcohol on Petitioner when she was within a foot of him and he exhibited no objective symptoms of intoxication.  (*Id.* at 489).  Additionally, Chula Vista Police Officer Johnathon Deering testified that while he was enclosed in his patrol car with Petitioner for 20 minutes, he did not smell alcohol and Petitioner did not appear to be under the influence of either alcohol or a controlled substance.  (*Id.* at 501-02).  Chula Vista Police Officer Michael Varga also testified that he did not detect the odor of alcohol coming from Petitioner and did not notice objective symptoms of intoxication.  (*Id.* at 535).

Chula Vista Police Officer Ricardo Cruz testified that after Macagno told him Petitioner drank bourbon, he paid particular attention to Petitioner's mannerisms.  (*Id.* at 619).  Officer Cruz explained that Petitioner responded to commands immediately, "which struck [Officer Cruz] as odd. [He] thought if this man is inebriated he is going to take a while to respond, he is going to stagger over . . . ." (*Id.*).  Officer Cruz stated that Petitioner's

16cv720-JLS-MDD

gait as he walked while handcuffed was "perfect," which surprised Officer Cruz because "most people that are inebriated will have a stagger gait, would be off balance." (*Id.* at 620). Officer Cruz explained that he was looking for the objective symptoms of intoxication and did not see any. (*Id.* at 621). After lengthy questioning regarding Petitioner's level of intoxication, Officer Cruz testified: "Let me put it to you this way:  If this contact had occurred out in the field and he was driving under the same circumstances, had he not been arrested, I would have handed him his keys back.  That is how confident I was that he was not under the influence." (*Id.* at 633).

While intoxication is a defense to murder and a blood sample could have exculpatory value, the police officers testimonies evince that it was not apparent to them at the time of Petitioner's arrest that he was intoxicated. As such, it was not apparent that Petitioner's blood sample, if it were taken, would have had exculpatory value.  Further, Petitioner has not demonstrated that the police acted in bad faith.  *See Youngblood*, 488 U.S. at 59 ("the police do not have a constitutional duty to perform any particular tests"); *Villafuerte v. Stewart*, 111 F.3d 616, 625-26 (9th Cir. 1997) (finding that the petitioner had not demonstrated that the failure to test a semen sample amounted to bad faith because there was no evidence that it had exculpatory value apparent to the officers at the time police failed to test the sample) (cert. denied, 522 U.S. 1079 (1998)).

The state court's adjudication did not result in a decision contrary to federal law and was not an unreasonable application of federal law.  *See* 28 U.S.C. § 2254(d); *Early*, 537 U.S. at 8.  Accordingly, the Court **RECOMMENDS** claim two (2) be **DENIED**.

//

//

# V.  CONCLUSION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS HEREBY ORDERED** that no later than **February 14, 2017**, any party to this action may file written objections with this Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **February 21, 2017**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appear of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998).

**IT IS SO ORDERED.**

Dated:   January 23, 2017

Hon. Mitchell D. Dembin
United States Magistrate Judge

16cv720-JLS-MDD